Michael CAMPODONICO, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 14089.

United States Court of Appeals
Ninth Circuit.

April 27, 1955.

Rehearing Denied May 27, 1955.

Willens & Boscoe, Donald D. Boscoe, Stockton, Cal., Emmet J. Seawell, Sacramento, Cal., for appellant.

H. Brian Holland, Asst. Atty. Gen., Lloyd H. Burke, U. S. Atty., Clyde Maxwell, Jr., Atty., I.R.S., San Francisco, Cal., Thomas J. Sullivan, Atty., I.R.S., Los Angeles, Cal., for appellee.

Before MATHEWS, HEALY and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

Unlike many other trapped tax-evaders, the appellant does not maintain, like Abimelech of Gerar, that "In the integrity of my heart and innocency of my hands have I done this".[1] With his admitted record of gambling, bootlegging, embezzlement, perjury, and prostitution, such a protestation of purity would hardly be convincing.

On the contrary, the appellant relies upon such technical defenses as these:

"The case at bar is not a proper case in which to apply the net worth theory as it did not clearly and accurately establish by competent evidence the net worth of the appellant for any one of the tax years in question, nor did it produce evidence that excluded all possible sources of taxable income from which any increase of net worth and the excess expenditures could have been derived.

" 'A strict interpretation of corroboration requirements for circumstantial evidence when used to establish a beginning net worth has been established' by four Supreme Court cases."

Our task, then, is to examine these and similar finespun arguments with the requisite amount of dispassionate judicial calm.

## 1. Statement Of The Case

The indictment, in five counts, charged violations of 26 U.S.C.A. § 145(b), which punishes "Failure to collect and pay over tax, or attempt to defeat or evade tax." Count One alleged that, for the year 1946, the appellant filed a fraudulent joint income tax return for his wife and himself, understating their income tax by $11,730.98. Count Two made similar allegations regarding the appellant's separate return for 1947, charging an understatement of $2,237.47. Count Three dealt with the wife's tax for 1947, alleging that he filed a fraudulent return for her showing the tax due to be $2,317.97 less than the correct amount. In Count Four, it was alleged that the appellant's joint return for 1948, for himself and his wife, was fraudulently $488.52 less than the correct amount. Count Five alleged that the appellant fraudulently understated the joint income tax of his wife and himself for 1949 by $4,775.94.

The appellant waived a jury trial on May 13, 1952, when the taking of testimony began. On May 14, 1952, at the close of the appellee's case, the appellant moved for a judgment of acquittal. The trial was continued in order that briefs might be submitted and that the appellant's motion might be considered by the Court. On August 8, 1952, the trial judge denied the motion for acquittal, and the appellee reopened its case in chief by putting on another witness. The appellant renewed his motion for acquittal, which was denied. The case was continued to September 5, 1952, for final argument.

On June 13, 1953, the trial judge filed a "memorandum and order" adjudging the appellant guilty on each of the five counts, and fixing July 3, 1953, as the date for "judgment and sentence". On July 17, 1953, the appellant filed a motion in arrest of judgment, alleging that the Court was "without jurisdiction of the offense and the defendant, in that the defendant has been deprived of a speedy trial in violation of the Sixth Amendment

1. Gen. 20:5.

* * *." This motion was denied. On the same day, the Court sentenced the appellant to eighteen months' imprisonment and fined him $5,000 on Count One, and sentenced him to eighteen months' imprisonment on Count Two, the sentences to run concurrently. No sentence was imposed as to Count Three, and the appellant's motion for acquittal was granted as to Counts Four and Five.

In view of the appellant's argument, to be discussed hereafter, based upon the Sixth Amendment, the chronology of the trial has been given somewhat fully.

### 2. The Appellee's Evidence

■ It is hornbook law that even in a criminal case tried to the court, an appellate tribunal will consider the evidence most favorably to the prosecution and will resolve all reasonable intendments in support of the verdict or the judgment.[2] In the instant case, however, our task is further simplified by the fact that the appellant put no witnesses upon the stand but presented his case in the form of certain stipulations that need not be rehearsed here.

The appellee's case, then, may be briefly summarized as follows:

From 1943 or 1944 to May, 1947, the appellant was a bouncer, floor man, and substitute manager of a gambling house in Stockton, California. We have already referred to some of his other activities.

His income tax returns for 1945 to 1949, inclusive, were prepared by Mrs. Eva M. McNabb, his employer's bookkeeper.

Chester R. Taynton, an Internal Revenue Agent, investigated the appellant's income tax liabilities. He asked for the appellant's books and records, but was given none. The appellant said that he kept no books. The Revenue Agent then attempted to assemble information with respect to the appellant's net worth. He found no evidence of any cash on hand at the end of 1945, but discovered that at the end of 1946 the appellant had cash on hand amounting to $23,247.25. The appellant's entire assets as of December 31, 1945, totaled $10,525.00.

Taynton examined the public records, inquired at all local banks, and made an audit of the Capitola Liquor Store, in which the appellant had a one-half interest.

The Internal Revenue Agent testified that the appellant said "his personal living expenses ran around $60 a month, and the Bureau's records of taxes paid showed $166.76 in 1946, $143.74 in 1947, $804.73 in 1948, and $295 in 1949".

For the year 1946, the increase in net worth was $34,296.67; for 1947, it was $23,140.77; for 1948, the gain was $6,297.08; and for 1949, the increase was $20,190.78.

In his reply brief, the appellant challenges the appellee's statement "that appellant was well known as a gambler during the years involved". Says the appellant:

"Consider this bald statement in the light of the testimony of *all* the Government witnesses that he is not a gambler." (Emphasis is the appellant's.)

The foregoing statement is grossly erroneous. Rosario Mandalari testified that he played cards with the appellant for money.

When Revenue Agent Taynton asked the chief of police of Stockton "if he could give me any information on Mike Campodonico, * * * he said, 'Mike Campodonico, oh, yes—a pimp and a gambler'."

Taynton asked the appellant "where he got all the money to buy all the assets when he hadn't reported that much income", and the latter replied that "he made it gambling"—that "he was a gambler".

Wareham Seaman, a tax attorney, retained by the appellant, testified concern-

2. Pasadena Research Laboratories v. United States, 9 Cir., 1948, 169 F.2d 375, 380, certiorari denied, 335 U.S. 853–854, 69 S.Ct. 83, 93 L.Ed. 401, and Norwitt v. United States, 9 Cir., 1952, 195 F.2d 127, 134, certiorari denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 635.

ing a meeting held in his office on May 4, 1950, at which Shirley S. Atkin, a Special Agent of the Intelligence Unit of the Bureau of Internal Revenue; Taynton, Seaman, and the appellant were present. At that conference the appellant made a sworn statement which, at a meeting held in Seaman's office on May 31, 1950, the appellant refused to sign "because it did not represent the truth". Atkin requested that the appellant make another statement that would be the truth, but the appellant, according to Seaman, "stated that he would not make this statement, upon my advice".

During the cross-examination of Seaman, counsel for the appellant announced that the attorney-client privilege was being "waived completely".

Thereupon Seaman gave some illuminating testimony relative to the appellant's four separate and distinct explanations for "The entire increase in his assets for the years '46 to '49". The conflicting versions or "positions" were given to Seaman, his own lawyer:

1. "Well, as originally reported to me, and as stated in the statement of May 4, he stated that his income had been accumulated prior to [1943]. It had been accumulated from, as I said, gambling and prostitution, bootlegging * * * Going back, as I recall, as far as in the twenties. * * * That was his first position.

2. "As I recall, his next position was that he had accumulated all but $45,000, or approximately that, up until 1943, and that was from embezzled funds subsequent to '43; any increase since that was from embezzled funds.

3. "As I recall, his third position was that all of it had been accumulated from embezzled funds.

"Q. Not just the forty-five?

"A. Just the forty-five.

4. "I believe his final position on that was that the $40,000 had come from other than embezzled funds.

"Q. From what source?

"A. Gambling, from gambling.

"The Court. During what period?

"The Witness. From '43 on."

From the foregoing, it is clear that the appellant did not heed Mrs. McNabb's advice: "Never lie to your doctor or your attorney".

3. The Appellee Presented Substantial Evidence Of A Beginning Net Worth For The Appellant, As Well As Evidence Of His Assets And His Expenditures For 1946 and 1947.

As we have seen the appellant kept no books. In such a situation the appellee had a right to resort to the net worth increase-expenditures method of arriving at the appellant's income tax liability. In Holland v. United States, 1954, 348 U.S. 121, 129, 75 S.Ct. 127, 132, the Supreme Court, while recognizing the "pitfalls inherent in the net worth method", was careful to add that the "pitfalls" cannot be said to "foreclose its use".

"Evidence of unexplained funds or property in the hands of a taxpayer establishes a prima facie case of understatement of income. It is then incumbent on the defendant to overcome the logical inferences to be drawn from the facts proved." United States v. Hornstein, 7 Cir., 1949, 176 F.2d 217, 220.

In the instant case, the appellant has wholly failed "to overcome the logical inferences to be drawn from the facts proved."

The appellant relies heavily upon the case of Calderón v. United States, 9 Cir., 1953, 207 F.2d 377, 378, quoting therefrom at some length and declaring that it "alone is sufficient authority to reverse the case at bar". The Calderón case, however, was reversed by the Supreme Court on December 6, 1954, 348 U.S. 160, 75 S.Ct. 186.

We have carefully examined the record relating to the appellant's assets and expenditures for the years in question, summarized above, and we find that the appellee's evidence relating to the

beginning net worth and the increase in net worth supported the judgment of the trial court.

■ The appellee "is not required to prove a negative or to refute all possible speculation as to the source of the appellant's asserted funds". Gariepy v. United States, 6 Cir., 1951, 189 F.2d 459, 463, and cases cited. The Gariepy case is cited in an annotation in 97 L.Ed. 71.

■ Nor need the appellee "prove with mathematical certainty the precise amount of unreported, taxable income." Jelaza v. United States, 4 Cir., 1950, 179 F.2d 202, 203, and cases cited.

The appellant is inconsistent in his statements as to whether the appellee is required to establish a *possible* or a *probable* source of the taxpayer's income under the present-worth system. On one page of his reply brief, the appellant says:

"It is significant that Counsel for the Government has failed to name one case dispensing with the requirement of a *probable* source of income, and has chosen instead to rely upon isolated statements in the above authorities cited, in which a *possible* source of income was established." [Emphasis supplied.]

On the next page, however, the appellant relaxes his requirement to a *possible* source of income:

"It is submitted that had the Government known that the law requires the Government to establish a *possible* source of income, this prosecution would never have been undertaken." [Emphasis supplied.]

Finally, in the very next paragraph, the appellant goes back to the "probable" test:

"It appears from the brief of the Government in this case that there is no substantial disagreement as to the requirement in a net worth case that: (1) A satisfactory beginning net worth must be established; and (2) that a lucrative business or calling must also be proven [sic], to establish a *probable* source of taxable income." [Emphasis supplied.]

■ Be that as it may, the correct rule is authoritatively laid down in Holland v. United States, supra, 348 U.S. at pages 137–138, 75 S.Ct. at page 136:

"Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient."

■ A careful scrutiny of the transcript in this case convinces us that the appellee has adduced adequate "proof of a likely source" from which the trial judge "could reasonably find that the net worth increases sprang". In the case of an admitted and notorious gambler the "likely source" would be winnings from gambling. And it is too well settled to require citation of authority that such winnings constitute taxable income.

In four decisions handed down by the Supreme Court on December 6, 1954, lucid semaphores have been set up for the guidance of lower federal courts in the determination of income tax cases in which the taxpayer's non-existent or imperfect bookkeeping makes necessary a recourse to the present-worth method in arriving at his tax liability. In addition to the Calderón and Holland cases, already referred to, our highest tribunal has given us illuminating decisions in Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138, and in Smith v. United States, 348 U.S. 147, 75 S.Ct. 194. The importance of these four cases is emphasized in a per curiam decision handed down by the Supreme Court itself on January 10, 1955, appearing in Wabash R. R. Co. v. Drescher, 348 U.S. 904, 75 S.Ct. 288.

It is quite apparent that the appellant is not pleased with at least two of the foregoing decisions, since he devotes five

pages of his supplemental brief to a categorical statement of their alleged "isolated apparently conflicting statements". In addition, the appellant labels as "Disturbingly incomprehensible" the statement in United States v. Calderón, supra, 348 U.S. at page 165, 75 S.Ct. at page 189, that "we must search for independent evidence which will tend to establish the crime directly, without resort to the net worth method."

It is easily understandable that the appellant should be "disturbed" over Calderón. It damaged his argument considerably when, as we have seen, it reversed this Court's decision in that case—a decision upon which the appellant had relied so heavily that he cited or quoted from it five times in his briefs!

Be that as it may, those four decisions are now the law of the land. We believe that in the instant case the appellee has met the standards there laid down. There is in the record ample corroboration of the appellant's damaging admissions.

4. The Trial Court's Delay In Pronouncing Judgment Did Not Cause It To Lose Jurisdiction.

The appellant specifies as error the lower court's denial of "appellant's motion in arrest of judgment upon the grounds that the Court had lost jurisdiction to pronounce judgment therein in that the appellant had been denied a speedy trial in violation of the Sixth Amendment to the Constitution of the United States".

It is urged that "a year and two months from the beginning of a criminal trial lasting only twelve to fourteen hours, to the pronouncement of judgment, is utterly unfair and a denial of one's rights," etc.

Rule 48(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., reads as follows:

"If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

■ The appellant was indicted on November 26, 1951, and was brought to trial on May 3, 1952. That is not an inordinate delay.

The gravamen of the appellant's plaint, however, relates, as we have just said, to the lapse of time from the beginning of the trial to the pronouncement of judgment.

The appellant refers to four decisions as supporting his contention. Three of them are not in point: the delay occurred *after* a conviction by a jury or a plea of guilty. In the instant case, the delay occurred *before* the Court handed down its judgment of conviction. And even in two of those three cases, the convictions were *affirmed*. The fourth case, Pinkussohn v. United States, 7 Cir., 1937, 88 F.2d 70, 71, certiorari denied, 1937, 302 U.S. 702, 58 S.Ct. 21, 82 L.Ed. 542, was indeed tried to the Court, and the judgment was delayed for six months. But Pinkussohn does not aid the present appellant: the conviction was *affirmed*. The Circuit Court of Appeals did, however, deplore "the long delay that elapsed before the simple case with few or no legal questions involved, was disposed of."

In the instant case, it could hardly be said that there are "few or no legal questions involved," when the parties have filed five briefs in this Court and the Supreme Court has found it advisable to hand down four simultaneous decisions on the vexing subject of present worth alone.

Finally, the appellant does not deny that he did not demand a speedy trial, but contents himself with observing that—

"It certainly would have been an inappropriate act for the appellant to have brought mandamus to compel a Court to render its decision, es-

pecially so, since nearly all of the remarks of the Court in reference to the sufficiency of the evidence were favorable to the appellant."

█ If the appellant deemed it the better strategy not to press the trial court for a quick decision, he cannot now complain when the delayed judgment happens to have gone against him!

█ It is well settled in this Circuit that "The constitutional guaranty of a speedy trial is a personal right which may be waived by failure to assert it. Collins v. United States, 9 Cir., 157 F.2d 409." [3]

█ We know of no Constitutional, statutory, or judicial pronouncement that forbids a busy court from taking ample time to ponder involved and troublesome questions of law and of fact before handing down a decision. Speedy justice does not mean hasty justice.

5. Conclusion

The appellee's agents made a painstaking effort to reconstruct the appellant's net worth increase and expenditures for the crucial years of 1946 and 1947. The means that they employed and the results at which they arrived have already been adumbrated herein. The minutiæ of the investigations need not be detailed.

It was not necessary for the appellee to put upon the witness stand a parade of professional gamblers—or worse!—to affirm that on such and such a night they lost so many dollars to the appellant. His associates were not of the type that would volunteer information to the Government. Their reluctance, however, affords no reason why the appellant's responsibility for a loss to the federal fisc should go unwhipped.

The judgment is affirmed.

3. Danziger v. United States, 9 Cir., 1947, 161 F.2d 299, 301, certiorari denied, 1947, 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354. See also Daniels v. United States, 9 Cir., 1927, 17 F.2d 339, 344, certiorari denied, Appell v. United States, 1927, 274 U.S. 744–745, 47 S.Ct. 591, 71 L.Ed. 1325; Iva Ikuko Toguri D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, 349–350, certiorari denied, 1952, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343.