R. Milo GILBERT, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17034.

United States Court of Appeals Ninth Circuit.

March 30, 1961.

Rehearing Denied May 19, 1961.

Albert A. Dorn and Wirin, Rissman, Okrand & Posner, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Thomas R. Sheridan, Minoru Inadomi and Robert E. Hinerfeld, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and HAMLIN, Circuit Judges.

BARNES, Circuit Judge.

A complaint, charging forgery (18 U.S.C. § 495) of a certain check (United States Treasury check number 11,260,-576, dated June 2, 1958, in the amount of $848.11) was filed before a United States Commissioner on January 2, 1959. On the same day a warrant for the arrest of the appellant was issued,[1] requiring ap-

1. The warrant read as follows:

"Warrant of Arrest

"To Any U. S. Marshal or Other Authorized Officer
"You are hereby commanded to arrest    R. Milo Gilbert
                                       (name of defendant)

and bring him forthwith before the nearest available United States Commissioner to answer to a complaint charging him with Forgery of a United States Treasury check in the amount $848.11 (here describe offense charged in complaint) in violation of U.S.C. Title, 18, Section 495
"Date January 2, 1959.          s/  Theodore Hocke
                                "Theodore Hocke, United States
                                               Commissioner.'
"1. Here insert designation of officer to whom warrant is issued.
                        "Return
"Received Jan. 5, 1959 at Los Angeles, and executed by arrest of R. Milo Gilbert at Los Angeles Calif on Jan 5, 1959.
                        "s/  Robert W. Ware
                                "Name.
                        "U. S. Marshal
                                "Title.
"Date  January 5               So. District of California.
  "     , 1959.        By
                        "s/  Fred L(?) Sharpley, Deputy"

pellant to answer the complaint relating to the forgery of the one check described above.

Appellant was an accountant specializing in preparing income tax returns for clients and in advising his clients concerning their form, the inclusions, and the deductions. There is little doubt, from an examination of the record, that appellant was pursuing a steady plan of falsifying his clients' returns by adding income tax deductions not incurred or claimed by them to their returns after they had signed them, requesting a refund from the government in the clients' names, and pocketing the same, allegedly by forging a client's name, i. e., cashing the government checks by endorsing the checks as trustee for the payees, which he was not, either in fact or law. For the purpose of this part of this opinion, we find there was more than sufficient evidence to support appellant's conviction on each of the 35 counts of which he was indicted, if all such evidence were properly admissible.

Count 21 is the sole count relating to the check numbered 11,260,576, dated June 2, 1958, in the amount of $848.11, payable to Daniel H. and Chalrene (sic) R. Bartfield—the check mentioned in the warrant issued January 2, 1959.

Count 22 relates to another check in the amount of $556.04 payable to the same payees, Mr. and Mrs. Bartfield.

All the other 33 counts relate to returns of, refund demands for, or checks payable to, other and different clients.

Hirst, the Special Agent of the United States Secret Service, who had filed the complaint and obtained the warrant, proceeded to serve it. He went to appellant's combined home and office, arrested him,[2] stated he wanted "the tax records of defendant and his clients." Appellant produced the records, and invited inspection of others in the garage, according to government witnesses. Appellant states he was threatened the search would be made by force, if necessary, and if he did not turn over his records, and after talking to his attorney, appellant "did not restrain the government officers further." [3]

Appellant describes that which the government agents seized as "thousands of documents." The motion filed for the return of seized property referred to "files" containing papers and references relating to one hundred and eighty-five single persons, married couples, partnerships or corporations; an unspecified number of tax control sheets covering an eight year period, seven powers of attorney, one ledger book, four boxes or envelopes containing records, and five categories of groups of personal records, bills, checks, clients' work sheets, and miscellaneous clients' letters, notes and memos—in all some two hundred and three items. Some thirty-four of such items were returned by the government, the balance were retained.

On May 13, 1959, a twenty-two count indictment was filed against appellant; and later, on August 5, 1959, the super-

2. Appellant urges this was a "purported arrest" because the return shows the date of arrest as January 5th, 1959 (the date of the return). The return was obviously in error, but the error in the return cannot affect the true facts as to the date of arrest, where no party or counsel has been misled or deceived. Nor can an error in a ministerial act void the warrant (cf. Evans v. United States, 6 Cir., 1957, 242 F.2d 534, 536, certiorari denied 353 U.S. 976, 77 S.Ct. 1059, 1 L.Ed.2d 1137), even if there is a complete failure to make any return. Rose v. United States, 6 Cir., 1921, 274 F. 245, 250. The case was tried below on the theory the arrest on January 2, 1959, was lawful. Appellant's counsel stated: "I do not deny that the arrest was anything but lawful."

3. We agree with appellant that the trial court, having suppressed part of the papers seized, impliedly found no consent by defendant to the search. That would not prevent this court from considering such an issue. We find a disputed question of fact determined by the trial court as a lack of consent, and we do not find a sufficient showing to enable us to hold such implied finding clearly erroneous. Fed.R.Crim.P. 52(a), 18 U.S.C.

seding thirty-five count indictment hereinabove described was filed.

Appellant, prior to trial filed a timely motion for the return of the seized property and for the suppression of all evidence obtained by such search and seizure.

This motion to suppress "was granted as to all files except those relating to the four checks," as set forth in Counts 12, 13, 14, 15, 16, 17, 21 and 22, and denied as to such files. These unaffected counts related to the following nine checks, described by the year of issue, check number and client, as follows:

| Count No. | Year | Check No. | Client |
|---|---|---|---|
| 12 | 1957 | 10,643,497 | James J. Manion |
| 13 | 1957 | 10,685,637 | Marion Manion |
| 14 | 1957 | 10,707,063 | "          " |
| 15 | 1957 | 10,730,575 | James J. Manion |
| 16 | 1957 | 10,768,977 | N. and T. Libling |
| 17 | 1957 | 12,054,960 | Dolores J. Frankel |
| 18 | 1957 | 12,054,961 | Fay Matorian [4] |
| 21 | 1958 | 11,260,576 | Daniel H. and Chalrene Bartfield |
| 22 | 1958 | 11,260,577 | "    "  "       "        " |

The counts charged either forgery of the checks (18 U.S.C. § 495) or wilfully presenting a forged check to an agency of the United States with intent to defraud (18 U.S.C. § 1001); or aiding or advising the filing of a fraudulent return (26 U.S.C. § 7206(2) ).

Appellant was tried on all thirty-five counts. The jury acquitted appellant on Counts 1, 2, 3 and 35, and found appellant guilty of Counts 4 to 34, inclusive. Appellant was sentenced to thirty-one consecutive sentences of one year and one day on each of Counts 4 to 34, inclusive.

One further factual matter requires recital. Appellant had been under investigation by the government taxing authorities during most of 1958, and had refused to cooperate with government investigators by turning over "all of his files and records" after their alleged request therefor. Appellant testified that Special Agent Hirst telephoned appellant in De-

cember 1958, but no contact between them was then made; that agent Hirst again telephoned appellant on January 2, 1959, about 2:00 P.M.; that appellant first offered to come to Hirst's office, subsequently to meet Hirst at a public restaurant; that Hirst insisted on meeting appellant at his home; that agent Hirst, and agent Coyne then arrived at appellant's home about 4:30 P.M., and arrested appellant; that two other agents, Borchardt and Lewis, arrived almost immediately thereafter, and participated in the search. This factual sequence, says appellant, proves that the government officers were trying to maneuver the arrest of appellant so that it would take place physically at a place where they could search appellant's files, as an incident to his arrest, without a search warrant, and as extensively as they desired.

On this appeal the appellant makes no objection to the introduction of evidence

4. By formal order thereafter made, the files relating to Fay Matorian and additional files relating to James J. and Marion Manion were not suppressed. Count 18 involved check number 12,054,961, dated in 1957, payable to Fay Matorian. This first had been included in the court's oral decision as to what should not be supressed, but had been omitted from the clerk's minute order.

The counts involving the Manions were 8, 9, 10 and 11, covering returns for the husband and wife in the years 1955 and 1956.

obtained by the search and seizure with respect to the conviction on Counts 21 and 22, relating to the Bartfield checks. One of these checks was the subject of the original warrant for appellant's arrest on the charge of forgery. But appellant urges error in the appellant's conviction on the twenty-nine other counts, charging (a) that the evidence relating to eleven counts (Counts 8 to 18, inclusive) offered by the government (and which was not suppressed by the trial court's suppression order) had been obtained illegally from files relating to *other crimes*, i. e., other forgeries or false claims. (The trial court took the position these files were all *instrumentalities* of the crime of forgery.) (b) That the evidence relating to eighteen counts (Counts 4 to 7, inclusive, 19, 20 and 23 to 34, inclusive) offered by the government (although such files had been returned to appellant by the lower court's order) had been obtained illegally, or leads as to further proof of such counts had been obtained illegally, from those files during the time the government had maintained possession of them. These counts, relating to the following persons for the respective years cited, were:

| Count | Client | Years Covered by Return |
|---|---|---|
| 4 | Louis Dunoff | 1956 |
| 5 | Beatrice Dunoff | 1956 |
| 6 | Bernard Arond | 1956 |
| 7 | Mollie Arond | 1956 |
| 19 | Sam Matorian | 1957 |
| 20 | Allen Frankel | 1957 |
| 23 | Juventino Silva | 1956 |
| 24 | Celia Sally Silva | 1956 |
| 25 | Juventino Silva | 1957 |
| 26 | Celia Sally Silva | 1957 |
| 27 | Juventino Silva | 1958 |
| 28 | Celia Sally Silva | 1958 |
| 29 | Raul Anchondo | 1956 |
| 30 | Angelo Anchondo | 1956 |
| 31 | Raul Anchondo | 1957 |
| 32 | Angelo Anchondo | 1957 |
| 33 | Raul Anchondo | 1958 |
| 34 | Angelo Anchondo | 1958 |

Counts 8 to 11, relating to the Manions, are based on alleged false returns. Exhibits 19 and 22 were offered in evidence to support such charge. Exhibit 19 consisted of notes, in Mr. Manion's handwriting, and prepared by him, showing his 1955 income and expenses as a public relations consultant, and his wife's 1955 income and expenses as a consultant for "Relaxicisor." This had been sent through the mail to appellant and was the basis, as such figures were falsified and increased by appellant, of the false 1955 income tax returns for Mr. and Mrs. Manion. Exhibit 22 consisted of similar material, in Mr. Manion's handwriting, and prepared by him, similarly sent to Mr. Gilbert, and similarly used by appellant to prepare Mr. and Mrs. Manion's 1956 income tax returns with fictitious and fraudulent increased figures for deductions.

Objection was made to Exhibits 19 and 22 upon the ground the documents had been illegally seized by means of an illegal search. The objection was overruled upon the ground the documents did not belong to defendant Gilbert, and hence Gil-

bert was not in a position to object to their seizure.

█ During the trial defendant's counsel objected to the admission of crucial evidence in support of any and all counts, other than those relating to the Bartfields (Counts 21 and 22), upon the ground the evidence was obtained as a result of material gathered by an illegal search and seizure. This so-called "fruit of a poisoned tree" doctrine appellant urges with great vehemence. United States v. Alberti, D.C.S.D.N.Y.1954, 120 F.Supp. 171, 172. This point was kept alive by a motion to dismiss at the conclusion of the government's case. An offer was made by appellant's counsel to prove that all evidence (save as to Counts 21 and 22) was obtained by the government as a result of material gathered by and in the alleged illegal search and seizure of January 2, 1959. The government countered by an offer to prove none of it had; that the tax officials had "pulled * * * all of the returns which Mr. Gilbert prepared" and that such returns were under inspection long before January 2, 1959. The court ruled this was a collateral issue, neither side produced evidence, and the defendant's objection upon the ground of an illegal search was overruled. A motion was made at the conclusion of all evidence that the jury be directed to return a verdict for the defendant, upon similar grounds. After verdict and before sentence, a motion for a judgment notwithstanding the verdict, and for a new trial was made on similar grounds. Each was denied. Thus appellant's first point has been preserved throughout the trial, unless he had to object to every question or establish a running objection in the record. We assume he was not so required.

In addition to appellant's principal point with respect to the alleged illegal search and seizure, and the resultant "fruit of a poisoned tree" doctrine, appellant urges, secondly, that Exhibits 19 and 22 (the Manion material hereinabove referred to) were improperly admitted; thirdly, that endorsement by appellant of

various checks "as Trustee" does not constitute a forgery.

█ Appellant also urges (as his fourth point) errors in the introduction of evidence concerning the false and fraudulent returns, with respect to the alleged forgeries of checks, or with respect to the alleged false and fraudulent statements inducing payments (Counts 12 through 22). No authority is cited in support of this position, and appellant did not protect his record on this issue throughout the trial. We therefore will not pass upon it. Frazier v. David, 1922, 187 Cal. 724, 204 P. 17; 5 C.J.S. Appeal and Error § 1325, p. 342; Shell Petroleum Corp. v. Scully, 5 Cir., 1934, 71 F.2d 772.

█ As his fifth point, appellant urges the insufficiency of the evidence to support the verdicts as to Counts 21 and 22. We cannot agree. We are asked to assume the unnotarized signatures of the Bartfields' powers of attorney delivered to the appellant were sufficient as between the Bartfields and Gilbert to authorize the latter to endorse checks as a Trustee. This might enable a third person to recover from the Bartfields because they had placed in Gilbert's hands the power to act in a fraudulent manner, but such signing of the power of attorney did not authorize Gilbert to sign the government's checks which were the basis of Counts 21 and 22 on behalf of the Bartfields. Such authority to Gilbert was specifically denied by both Mr. Bartfield and Mrs. Bartfield. Appellant was never their Trustee, nor had they ever represented to anyone he was. Unless their conduct had harmed an innocent third party, Gilbert was not a Trustee for the purpose here under consideration.

Appellant signed the checks referred to in Counts 21 and 22 with the name of the taxpayers, "by R. Milo Gilbert, trustee." This was a status he did not have. He had a limited power to file a return, and to receive refunds, but not to realize them. The signature, in the Trustee capacity, was of a fictitious name and was a forgery. Rowley v. United States, 8 Cir., 1951, 191 F.2d 949; Milton v. United

States, 1940, 71 App.D.C. 394, 110 F.2d 556.

■ The jury was correctly instructed that a written power of attorney to prosecute a claim against the government and giving authority to an agent to *receive* a check, gives that agent no power to *endorse* and *collect* the check. Such authority may be given either orally or in writing. Cignetti v. American Trust Co., 1956, 139 Cal.App.2d 744, 294 P.2d 490; Burstein v. Sullivan, 1909, 134 App. Div. 623, 119 N.Y.S. 317. Tiffany, Agency, 82 (2d ed.).

■■ There being no proof of such authority in writing, appellant must rest on an oral authority to sign as Trustee, and realize upon the checks. Appellant claims he had this. Such authority was denied by both Bartfields. At best this presents a question of credibility, decided adversely to appellant below, and this evidence must be looked upon by us, on this appeal, in the light most favorable to support the government's case here. Campodonico v. United States, 9 Cir., 1955, 222 F.2d 310. When this is done, there is beyond question substantial evidence to support the conviction of appellant on Counts 21 and 22.

We go back again to appellant's first point, the alleged illegal search and seizure. We must determine the extent of a search that may properly be made without a search warrant, following a lawful arrest for a crime. The Fourth Amendment declares:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

In 1959 the Supreme Court stated its decisions on this subject "cannot be satisfactorily reconciled"—that "[the] problem has * * * provoked strong and fluctuating differences of views on the Court." [5]

That same decision also tells us the Harris [6] and Rabinowitz [7] cases set "by far the most permissive limits upon searches incidental to lawful arrests."

We first must determine whether any search (without considering its extent) was proper, i. e., lawful. One was, as incidental to an admittedly lawful arrest. We have here no evidence of an unlawful entry into premises.[8] There was no forced entry.[9] There was no entry by subterfuge.[10] There had been no previous unauthorized entry.[11] Neither had there been an abandonment of the records sought.[12] And no felony was being committed in the officers' presence at the time of arrest.[13]

■ We then reach the question, did the search extend beyond the area of reasonableness, i. e., was the search made within the limited permissible bounds incident to a lawful arrest? It is, of

5. Abel v. United States, 1960, 362 U.S. 217, 235, 80 S.Ct. 683, 695, 4 L.Ed.2d 668.

6. Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

7. United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

8. Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.

9. Miller v. United States, 1958, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332; Gatewood v. United States, 1953, 93 U.S. App.D.C. 226, 209 F.2d 789; United States v. Bowman, D.C.D.C.1956, 137 F. Supp. 385.

10. Leahy v. United States, 9 Cir., 1959, 272 F.2d 487, 489, writ of certiorari dismissed 364 U.S. 945, 81 S.Ct. 465, 5 L.Ed.2d 459.

11. United States v. Alberti, D.C.S.D.N.Y. 1954, 120 F.Supp. 171 (point not reached).

12. Hester v. United States, 1924, 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898; Abel v. United States, supra, 362 U.S. at page 241, 80 S.Ct. at page 698.

13. Harris v. United States, supra, 331 U.S. at page 155, 67 S.Ct. at page 1103.

course, patent that only unreasonable searches are prohibited by the Fourth Amendment.[14] The right to search the person after a valid arrest "always has been recognized in this country and in England."[15] How much further may the search go?

"What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case." United States v. Rabinowitz, supra, 339 U.S. at page 63, 70 S.Ct. at page 434, citing Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374.

We first examine the circumstances in cases where the particular search has been upheld. There is no question but that in addition to the search of the person of one who is arrested, the arresting officers may:

"* * * search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed * * * [T]he premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search [is] not 'unreasonable.'"[16] Id., 339 U.S. at page 61, 70 S.Ct. at page 433.

In Marron v. United States, 1927, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, the search for liquor described in the warrant uncovered a certain ledger and invoices pertaining to the liquor business. These were held validly seized only *because the arrest was for an offense committed in the presence of the invading officers.* And the area of permissible search extends to all parts of the premises used for the unlawful purpose *then taking place.*

█ Officers are not limited to a search in the one room where the arrest takes place. Harris v. United States, 1946, 331 U.S. 145, at page 152, 67 S.Ct. 1098, at page 1102, 91 L.Ed. 1399. There a search of a four-room apartment was upheld. In the Harris case, the facts are in general quite similar to the instant case. There two valid warrants of arrest were issued. One charged violation of a Mail Fraud Statute, in the mailing of a forged $25,000 check. The second charged transportation of a forged $25,000 check in interstate commerce with intent to defraud. The search was to find two $10,000 *legitimate* cancelled checks, thought to have been used in effecting the forgery. In addition, "the search was said to be for the purpose of locating 'any means that might [have been] used to commit these two crimes, such as burglar tools, pens, or anything that could be used in a confidence game of this type.'"[17] The arrest took place in the living room, and it, a bedroom, a bathroom and a kitchen were each carefully searched. In a bedroom bureau drawer a sealed envelope was found and within it, eight "Notice of Classification" cards and eleven "Registration Certificates," bear-

14. United States v. Rabinowitz, supra, 339 U.S. at page 60, 70 S.Ct. at page 432; Carroll v. United States, 1925, 267 U.S. 132, 147, 45 S.Ct. 280, 69 L.Ed. 543.

15. United States v. Rabinowitz, supra, 339 U.S. at page 60, 70 S.Ct. at page 432; Weeks v. United States, 1914, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652.

16. Citing Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145; Carroll v. United States, supra, 267 U.S. at page 158, 45 S.Ct. at page 287; Boyd

v. United States, 1886, 116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746.

17. This quotation is from Harris v. United States, supra, 331 U.S. at pages 148–149, 67 S.Ct. at page 1100. The inside quotation apparently was taken from the oral testimony of one or more of five Federal Bureau of Investigation Agents who made the arrest and search. See note 8, at page 149 of 331 U.S. at page 1100 of 67 S.Ct., Harris v. United States, supra.

ing the stamp of Local Board No. 7 of Oklahoma County, all being papers relating to the National Selective Training or Service Act of 1940. The defendant was charged in sixteen counts of unlawful possession, concealment and alteration of such cards. The evidence from the envelope was that upon which defendant's conviction was based, and against which a motion to suppress was directed. It was conceded "that the evidence is in no way related to the crimes for which petitioner was initially arrested," [18] and that the search was made without a search warrant.

The district court denied the motion to suppress without opinion. The court of appeals affirmed, finding the search was conducted in good faith, "that it was not a general exploratory search for merely evidentiary materials, and that the search and seizure were a reasonable incident to petitioner's arrest." [19]

The Supreme Court, after saying what the Harris search was not, then said:

"Nor is this a case in which law-enforcement officers have entered premises ostensibly for the purpose of making an arrest but in reality for the purpose of conducting a general exploratory search for merely evidentiary materials tending to connect the accused with some crime. Go-Bart Importing Company v. United States, supra; United States v. Lefkowitz, supra [285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877]. In the present case the agents were in possession of facts indicating petitioner's probable guilt of the crimes for which the warrants of arrest were issued. The search was not a general exploration but was specifically directed to the means and instrumentalities by which the crimes charged had been committed, particularly the two canceled checks of the Mudge Oil Company. The Circuit Court of Appeals found and the District Court acted on the assump-

tion that the agents conducted their search in good faith for the purpose of discovering the objects specified. That determination is supported by the record. The two canceled checks were stolen from the offices of the Mudge Oil Company. There was evidence connecting petitioner with that theft. The search which followed the arrest was appropriate for the discovery of such objects. Nothing in the agents' conduct was inconsistent with their declared purpose.

"Furthermore, the objects sought for and those actually discovered were properly subject to seizure. This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime. Clearly the checks and other means and instrumentalities of the crimes charged in the warrants toward which the search was directed as well as the draft cards which were in fact seized fall within that class of objects properly subject to seizure. Certainly this is not a case of search for or seizure of an individual's private papers, nor does it involve a prosecution based upon the expression of political or religious views in such papers.

"Nor is it a significant consideration that the draft cards which were seized were not related to the crimes for which petitioner was arrested. Here during the course of a valid search the agents came upon prop-

18. Id., 331 U.S. at page 149, 67 S.Ct. at page 1100.

19. Id., 331 U.S. at page 150, 67 S.Ct. at page 1101.

erty of the United States in the illegal custody of the petitioner. It was property to which the Government was entitled to possession. In keeping the draft cards in his custody petitioner was guilty of a serious and continuing offense against the laws of the United States. A crime was thus being committed in the very presence of the agents conducting the search. Nothing in the decisions of this Court gives support to the suggestion that under such circumstances the law-enforcement officials must impotently stand aside and refrain from seizing such contraband material. If entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents of government property the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated." Harris v. United States, supra, 331 U.S. at pages 153–156, 67 S.Ct. at page 1102.

We find several factors existing in the instant case which differ from the Harris case:

(1) Here the cancelled check upon which the original warrant was based was a government check, and hence in the possession of the government. The government's agents did not need to search

anything (other than their own files) for it.

(2) Whether this search was made in good faith (as was found in Harris, supra) and was not purely an exploratory search (as was found in Go-Bart Importing Co. v. United States, supra, and United States v. Lefkowitz, 1932, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877), is clouded by the alleged maneuvering of Special Agent Hirst to make the arrest in appellant's combined home and office, and not on the street, in the Federal Building, or in a public restaurant.

(3) In Harris, supra, the seized "draft cards," were property the mere possession of which was a crime.[20] It was property of which the United States was entitled to possession.[21] Here neither the possession of copies of various taxpayers' returns, nor of their or the appellant's work papers to support the returns, was in any way illegal; nor was the United States entitled to possession. At best, the United States was entitled to examine.

(4) In Harris, supra, in keeping the draft cards in his custody, petitioner was guilty of a serious and continuing offense against the laws of the United States. "A crime was thus being committed in the very presence of the agents conducting the search." [22] In the instant case, possession or custody of the returns, work papers, or even of uncashed government checks was no offense against the laws of the United States, and no offense was be-

20. "54 Stat. 885, 894–895, 50 U.S.C.App. § 311. Section 623.61–2 of the Selective Service Regulations states that 'It shall be a violation of these regulations for any person to have in his possession' a Notice of Classification not regularly issued to him or to alter or forge any Notice of Classification. Section 11 of the Act makes * * * the failure to perform any duty required by the Regulations punishable by imprisonment for not more than five years or a fine of not more than $10,000 or both." Harris v. United States, supra, 331 U.S. at page 147 note 2, 67 S.Ct. at page 1099.

"35 Stat. 1098, 18 U.S.C. § 101. Insofar as pertinent, the section provides: 'Whoever shall receive, conceal, or aid in concealing, or shall have or retain in his possession with intent to convert to his own use or gain, any * * * property of the United States, which has theretofore been embezzled, stolen, or purloined by any other person, knowing the same to have been so embezzled, stolen, or purloined, shall be fined not more than $5,000, or imprisoned not more than five years, or both; * * *.'" Harris v. United States, supra, 331 U.S. at page 147 note 3, 67 S.Ct. at page 1099.

21. Davis v. United States, 1946, 328 U.S. 582, 590, 66 S.Ct. 1256, 90 L.Ed. 1453.

22. Harris v. United States, supra, 331 U.S. at page 155, 67 S.Ct. at page 1103.

ing committed in the presence of the agents making the arrest.

Likewise, in United States v. Rabinowitz, supra, the "Kansas" and "Nebraska" overprinted postage stamps therein involved constituted a fraud on the government, and the mere possession of such forged and altered stamps was a crime, "just as it is a crime to possess burglars' tools, lottery tickets or counterfeit money." [23]

Thus the objects originally seized herein were not utilized to perpetrate a crime any more than any other evidentiary material which leads to an ultimate conclusion that a crime has been committed. This distinction is one "of importance, for 'limitations upon the fruit to be gathered tend to limit the quest itself * * *.'" [24]

We think we must recognize and respect

"* * * the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including [1] the instrumentalities and means by which a crime is committed, [2] the fruits of crime such as stolen property, [3] weapons by which escape of the person arrested might be effected, and [4] property the possession of which is a crime." Harris v. United States, supra, 331 U.S. at

page 154, 67 S.Ct. at page 1103. (Numbers inserted.)

The government relies on the foregoing language (previously quoted herein), but we think it supports appellant on the facts of this case. To make it apt, the government cites the facts of Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, and emphasizes the physical evidence seized therein (a piece of graph paper, two birth certificates, a vaccination certificate, a bank book, a hollowed out pencil containing eighteen microfilms, and a "cipher pad.") [25] While the defendant Abel was tried upon a charge of conspiracy to commit espionage, the search in question arose out of his administrative arrest by the United States Immigration and Naturalization Service as a preliminary to his deportation as an alien suspected and officially accused of espionage. Cf. 362 U.S. 217, 218–219, 80 S.Ct. 683, 687.

In Abel, Mr. Justice Frankfurter says:

"The only things sought here, in addition to weapons, were documents connected with petitioner's status as an alien. These may well be considered as instruments or means for accomplishing his illegal status, and thus proper objects of search under Harris, supra." Id., 362 U.S. at page 237, 80 S.Ct. at page 696.

The Court goes on: "[I]tem (2), [was] a forged New York birth certificate for 'Martin Collins,' one of the false identities which petitioner assumed in this country * * * to keep his presence here undetected." This was a document

23. United States v. Rabinowitz, supra, 339 U.S. at page 64, 70 S.Ct. at page 434.

24. Id., 339 U.S. at page 64 note 6, 70 S. Ct. at page 434, quoting United States v. Poller, 2 Cir., 1930, 43 F.2d 911, at page 914, 74 A.L.R. 1382.

25. "(1) a piece of graph paper, carrying groups of numbers arranged in rows, allegedly a coded message;

"(2) a forged birth certificate, certifying the birth of 'Martin Collins' in New York County in 1897;

"(3) a birth certificate, certifying the birth of 'Emil Goldfus' in New York in 1902 (Emil Goldfus died in 1903);

"(4) an international certificate of vaccination, issued in New York to 'Martin Collins' in 1957;

"(5) a bank book of the East River Savings Bank containing the account of 'Emil Goldfus';

"(6) a hollowed-out pencil containing 18 microfilms; and

"(7) a block of wood, wrapped in sandpaper, and containing within it a small booklet with a series of numbers on each page, a so-called 'cipher pad.'" Abel v. United States, supra, 362 U.S. at page 220, 80 S.Ct. at page 687.

"used as a means to commit crime" (Id., 362 U.S. at page 238, 80 S.Ct. at page 696). Item (1), the graph paper, was seized when petitioner attempted to hide it at the time of his arrest. This was valid seizure to prevent destruction. Items (3), (4) and (5) were documents taken by petitioner with him to a place of subsequent search. "They were all capable of being used to establish and maintain a false identity * * *." Items (6) and (7) were articles abandoned in a vacated room. They were *bona vacantia*, and the government was entitled to appropriate them.

While the files taken in this case approach the category of some of the items seizable in Abel, yet they do differ, and if we respect the boundaries laid down in Harris, supra, and Rabinowitz, supra, reaffirmed by Abel, as we see such lines of distinction drawn, we are constrained to hold the search and seizure in this case went too far.

Administrative arrest of an alien suspected and accused of espionage preliminary to deportation inherently and logically creates an opportunity for search and seizure far larger in scope and area than search of either alien or citizen incidental to an arrest on a charge of forgery of a single check.

Appellee relies heavily on our holding in Leahy v. United States, 9 Cir., 1959, 272 F.2d 487, writ of certiorari dismissed 364 U.S. 945, 81 S.Ct. 465, 5 L.Ed.2d 459. If the appellant here had been accused in the warrant of a conspiracy to defraud the government by presenting false claims and obtaining checks through the filing of various fraudulent income tax returns in the names of various clients, then perhaps the search could have been honestly classified as one seeking certain records as the instrumentalities of an illicit business. Marron v. United States, 1927, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, and as was done in Leahy, supra. Further, as Judge Pope points out in his concurring opinion, there was in Leahy present the possibility of the destruction of evidence. No evidence of such a threat here exists.

We conclude that the motion of the appellant to suppress the evidence seized relating to all counts save Counts 21 and 22 should have been granted.

But this does not solve our problem. Appellant says if his motion to suppress had been granted, there would have been no evidence on twenty-nine of the counts. The government says they had had the returns of all the taxpayers represented by appellant "pulled" long before the arrest in this case; and that the testimony of such taxpayers would have been the same as was presented, regardless of the search.

We have no way of ascertaining what evidence the government could have produced, had the motion to suppress been granted. Holding that the motion to suppress must be granted, we are required to vacate the judgments of conviction and remand the matter for retrial on Counts 4 to 20, and 23 to 34.

On a retrial, we are not intimating any opinion that the evidence produced by the government against appellant was or was not "the fruit of a poisonous tree." That remains for the consideration of the trial court.

The conviction and sentences of the appellant on Counts 21 and 22 are, and each is, affirmed.

### On Petition for Rehearing

Appellant urges on petition for rehearing that the conviction of appellant on counts 21 and 22—forgery—should be reversed on the ground the opinion of this court was in error in stating that there was no proof in writing that appellant was authorized to *endorse* and *collect* the checks, and appellant cites Exhibit M—the power of attorney—as proof this court was wrong.

It would have been better for this court to have added the words "adequate and convincing" before the word "proof" (at page 592). We now amend our opinion of March 30, 1961, by such amendment. The sentence then reads:

"There being no adequate or convincing proof of such authority in

writing, appellant must rest on an oral authority to sign as Trustee, and realize upon the checks."

Exhibit M, on its face, authorizes "R. Milo Gilbert" to endorse and negotiate refund checks for income taxes. It nowhere purports to authorize "R. Mile Gilbert, Trustee" to so, or in any way, act.

Because the person named in a power of attorney as attorney in fact had some or all the obligations toward his principal of acting as a Trustee is required to act, does not make him a trustee in fact or law. Appellant had no authority, written or oral, to sign checks or otherwise act, as Trustee. He purported to so act, but could not do so by reason of any specific provision or authority granted by the power of attorney. If there were only evidence that appellant had acted solely in good faith and not fraudulently as Trustee, he might now be heard to claim his signing as Trustee was actually an act done pursuant to the power of attorney he held. But we cannot and do not so interpret his action, in view of the substantial evidence to support the fraudulent returns which were the basis of the refunds which resulted in the issuance of the checks upon which Counts 21 and 22 were based.

The foregoing is written upon the assumption that the written power of attorney was valid. As we pointed out in our opinion of March 30, 1961 (at page 591), the Bartfields denied that their signatures were notarized. Each admitted the signatures appeared to be theirs, but each denied ever having sworn to the jurat before any notary public. (Tr. p. 453-462.)

The notary public acknowledging the makers' signatures was Ruth Gilbert. Who she may be does not appear in the record. She did not testify in the case. She apparently was related to appellant Gilbert (Tr. p. 461), but the exact relationship is not disclosed.

The case was tried on the theory that the transactions which originated the subsequent issuance of the checks claimed to have been endorsed fraudulently were all material. The nature of the returns and all documents connected with the refunds, whether fraudulent or not, were material in the appraisal of the subsequent endorsement of "R. Milo Gilbert, Trustee."

The court and jury might well have concluded, as we might, to support the verdict, that the jury found the power of attorney was (a) a forgery, or (b) unnotarized and incomplete before delivery, or (c) executed in blank, or (d) executed with no specific power to endorse checks (which provision had been inserted after the original drafting by use of a caret).

But it is unnecessary for us to decide what theory appealed to the jury. We reaffirm there existed "beyond question substantial evidence to support the conviction of appellant on Counts 21 and 22"—concerning which the evidence had been properly obtained.

With the addition of the three words hereinabove set forth to the opinion, it is reaffirmed, and the petition for rehearing is otherwise in all respects denied.