Dean R. HANSBERRY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16810.

United States Court of Appeals Ninth Circuit.

Oct. 6, 1961.

Henry V. Cleary, Palm Springs, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Division, Los Angeles, Cal., Elmer Enstrom, Jr., Asst. U. S. Atty., San Diego, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and MURRAY, District Judge.

BARNES, Circuit Judge.

This is an appeal from a jury verdict and judgment of the district court adjudging appellant guilty of embezzling public funds while he was a disbursing officer of the United States in violation of 18 U.S.C. § 653. Jurisdiction below rested on 18 U.S.C. § 3231, and here rests on 28 U.S.C. §§ 1291 and 1294.

Appellant was charged with embezzling $63,000 on unknown dates "between December 1955 and June 24, 1957."

Five errors are asserted:

(1) Insufficiency of the evidence.

(2) Error in refusing to strike all evidence of appellant's financial condition prior to June of 1957.

(3) Error in permitting the government to "prove" embezzlement by use of the "net worth theory."

(4) Insufficient instructions with respect to "net worth theory."

(5) Error in instructing the jury on reasonable doubt.

Appellant conceded at oral argument that none of these points were urged below, or protected in the trial court. Appellant thus relies upon a showing of plain error. (Fed.R.Crim.P. 52(b), 18 U.S.C.A.)

An appellate court need not review an alleged error not urged below, Lawn v. United States, 1957, 355 U.S. 362, note 16, 78 S.Ct. 311, 2 L.Ed.2d 321, in the absence of extraordinary circumstances, particularly where the court is not convinced an injustice was done a defendant. Lohmann v. United States, 9 Cir., 1960, 285 F.2d 50, 51; Ryan v. United States, 9 Cir., 1960, 278 F.2d 836, 841; Grant v. United States, 9 Cir., 1961, 291 F.2d 746, 748.

I—The Facts.

Appellant enlisted in the Marine Corps as a private in 1936. At the time of the offense charged, he had by successive promotions reached the rank of Captain.

On July 1, 1957, he was to retire from the Service. His assignment in early 1957 was disbursing officer of the 2nd Infantry Training Regiment. A Captain Pross was to relieve appellant in that capacity. The changeover was to take place on June 25, 1957.

The disbursing officer had his private office in a Quonset hut. In it was a safe in which the disbursing officer's cash was kept. The disbursing officer alone, according to regulations, knew the combination of this safe.

Within the same Quonset hut was a partitioned shower. At 10:00 P.M. on June 24, 1957, hours before the changeover in disbursing officers was to take place, appellant left his minor children, without a baby-sitter, at his home in Oceanside and drove twenty-one miles to his office at the base. An armed guard, Corporal Tetems, was on duty. Appellant gave this guard a slip of paper, and requested the Corporal to obtain a certain enlisted man's pay record. This required

the Corporal to leave the premises. At 10:30 P.M., another guard (Corporal Goggins) came from the movies to relieve Corporal Tetems. The disbursing office was empty save for someone taking a shower. At 11:00 P.M., while sweeping the floor, Goggins noticed the safe door was open. Tetems shortly thereafter returned, being unable to obtain the pay records. The two Corporals called the Corporal of the Guard and endeavored to reach appellant at home by telephone. Within three hours the remaining cash in the safe was counted, and found to be $63,000 short of the $201,-667.53 for which appellant was accountable.

The assistant disbursing officer, that same morning of June 25th, commenced balancing the cash book. It was from this balance that the shortage was determined.[1] This shortage was acknowledged by appellant that same June 25th, 1957. (Exhibit 11.) Meanwhile, Captain Hansberry's actions on the night of June 24th, 1957, are described in Appellant's Brief (pp. 28–30) as follows:

"On June 24th, 1957, the Captain returned from work in the afternoon, had dinner, then he and Freeman Dougherty went to 704 No. Strand Street, where they did manual labor on the house for approximately three hours. He returned home and was in the process of cleaning up when he received a telephone call. The caller represented himself to be the officer of the day, and stated that he wanted an emergency leave payment made to a man whose family had been involved in an automobile accident. The caller asked if the Captain would come out to the base and make the payment. The caller gave the Captain the name,

[1]. "A cash book is a running record of disbursements and collections made by a disbursing officer. Cash is received initially by a disbursing officer from the officer he relieves. The disbursing officer then signs a statement [of] accountability for that sum of money. Said figure is inserted in the cash book, and thereafter the disbursing officer replenishes his cash by drawing 'exchange for cash' checks, and makes disbursements primarily in payment of the troops.

The disbursing officer can determine how much cash he actually has on hand. (R.T. p. 99)

Marine Corps regulations provide that all entries in the cash book, either disbursements or receipts of cash, should be vouchered or otherwise identifiable. Regulations further provide that all entries of receipts of cash should be entered on the day that the cash is received. Marine Corps regulations further provide that orderly, or more frequently if ordered by the commanding officer, a (sic) verification of the cash on hand of the disbursing officer shall be made by two or more officers. This verification is by regulations required to be a surprise audit. The officers are appointed by the commanding officer. They present themselves to the disbursing officer, exhibit the commanding officer's authorization, request the disbursing officer to open his safe, then actually conduct a cash count of the monies in his safe. While this cash count is being carried on, the disbursing officer then brings his cash book up to date by entering therein certain vouchers which are to be counted as cash. He then strikes a balance in his cash book, which balance should correspond with the balance reached by the verifying officers in their cash count. (R.T. p. 19). At the conclusion of the cash count, two verifying officers sign their name in the cash book, and verify therein that they have actually counted the amount of cash therein entered. If a discrepancy is noted by the verifying officers, a written report thereof is required to be made by them to the commanding officer.

Eldridge Comeaux received a telephone call in the early morning hours of June 25, 1957, as a result of which he went to the disbursing office of the 2nd Infantry Training Regiment. Mr. Comeaux is the assistant disbursing officer for the 2nd Infantry Training Regiment. At the time he arrived at the disbursing office, he took the cash book for his regiment (Exhibit 8) from his safe, entered the remaining vouchers and struck a balance as to the cash which should have been on hand. The accountability of the disbursing officer, as shown by the cash book on the morning of June 25th, 1957 was $201,667.53. The difference between that sum and the sums of cash on hand was $63,000.00. (Tr. pp. 103, 104.) The denominations of the money which were missing from the safe on the morning of June 25th, 1957 were: $40,000.00 in 20's; $10,000.00 in 10's; $10,000.00 in 5's; and $3,000.00 in 1's. (Tr. p. 120)." (Appellant's Brief, pp. 5–7.)

serial number, and outfit of the man involved. (R.T. pp. 769, 770)

"There are approximately thirty officers in this 2nd Infantry Training Regiment, and the Captain did not recognize the voice of the caller. (R.T. p. 770)

"There were three minor children at home alone at that time; the Captain unsuccessfully sought to obtain a baby sitter, and left the children alone and went to the base. (R.T. p. 771) He drove to the base and arrived there in the neighborhood of 10:00 o'clock. He walked up to his office in the area between the two disbursing offices, saw three enlisted men on the porch of the enlisted disbursing office, greeted them, and entered the front of his building. (R.T. p. 806)

"He walked in past the partition into the central portion of the office, and asked the guard on duty where the person to be paid was. He gave the guard the slip of paper on which was written the man's name, serial number and outfit, and requested that the guard obtain his pay record. As the guard was leaving he was asked for the number of the officer of the day who was stationed in the guard shack. (R.T. p 808) When the guard left he walked back into his own office, started looking through the phone book for the officer of the day's number, when he felt a gun in his back, and was told, 'never mind the phone'. He was also told not to turn around, do what he was told, and that the speaker had his girl in the car. (R.T. p. 809) He was instructed to open the safe. He did as he was instructed. He started putting money on top of the safe, was told to speed up when some one outside whispered that the movie was out. The man behind him then told him to leave the building and go straight to his car if he ever wanted to see his girl again. (R.T. p 810)

"He walked straight to his car, seeing no one. When he arrived at his car, someone in the backseat advised him to get in, and to start driving. He drove through the movie crowd, through the Camp San Onofre gate, and was directed to take the road towards Oceanside. When he arrived at the San Onofre Beach Club Road turnoff, he was directed to pull off toward the beach. He pulled into a dirt area and stopped. He was told to get out of the car. He got out, and was told to turn out the lights. He reached in and turned out the lights, turned, took a step, and was hit on the right side of the head. (R.T. pp. 812, 813) After a period of unconsciousness, he tried to get up, made some halfway attempts, and recalls a feeling or a sensation of rolling. (R.T. p. 813) Later he attempted to get up and down several times, and each time he commenced walking he had a tendency to fall off to his right. At this time he was on the sand, and actually did walk and fall in the water. (R.T. pp 813, 814) He called for help, remembers a light coming toward him, and he remembers talking to somebody, asking for the police, and asking if they had his girl. He remembers that they tried to help him up the cliff; he said that he could do it by himself. He got up to the car where he was asked some questions, and whether or not he could identify himself. Thereafter, his memory is not very accurate. The next he clearly remembers is that he was in an ambulance, and that the ambulance driver attempted to put his finger down the Captain's throat, pull his tongue out of his throat. (R.T. pp 814, 815)

"He was taken to the Naval Hospital at Camp Pendleton where he was retained one week. The only description of the man who held the gun on him, was that he had a heavyset, fat hand, which held a forty-five automatic, and the man was wearing a utility uniform. (R.T. p 819)."

■ The foregoing recital obviously represents the testimony *most favorable* to appellant. We do not propose to go

over the more than 1,200 pages of testimony to give examples of this.[2] But we are required, not to read the evidence in the most favorable way to the appellant, but the most favorable way to support the judgment. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 68 L.Ed. 680; Gilbert v. United States, 9 Cir., 1961, 291 F.2d 586, 592; United States v. Shaffer, 7 Cir., 1961, 291 F.2d 689, 691; Campodonico v. United States, 9 Cir., 1955, 222 F.2d 310.

While no one of the statements or admissions referred to in note 2, supra, had any tremendously devastating effect on appellant's story—they were matters of sufficient evidentiary importance, particularly when viewed accumulatively, to have strongly influenced a jury's thinking. Appellant blithely totally ignores them, and many others of substantial import, in reconstructing the "facts." Typical of the offhand way in which appellant tosses aside certain extremely incriminating evidence against him, in his statement of the facts, is his one paragraph summary of twenty pages of testimony with respect to the $2,000 down payment on the 704 Strand Street property acquired by appellant and his wife. It reads:

"On page 977, in cross-examining the witness about the source of the down payment for the purchase of

2. As minor examples—taken at random:
   (a) Appellant's Brief, p. 29: Appellant "walked straight to his car, seeing no one." Omitted is the following:
   "I walked out of the office feeling sure that I would be followed * * *. I realized there was no one with me at all, I was alone, * * * I * * * went straight to my car * * * —there were people in the background coming from the movies—and I saw no one in particular."
   (b) Appellant's Brief, p. 29: Appellant "drove through the movie crowd, through the Camp San Onofre gate, and was directed to take the road toward Oceanside."
   Tr. p. 811: "As I left the parking lot he said 'Go out the back gate'. Well, * * * the back gate to me meant San Onofre—I mean, meant the main side gate which went out to San Luis Rey. But I figured that that [San Onofre] was closest so I made an automatic right as I went out on the road and got no comment * * * no attempt by the sentry to stop me."
   Omitted is any reference to his lack of knowledge as to whether the man allegedly in the car had any gun; or the fact that he drove voluntarily past an armed sentry.
   (c) No reference in appellant's brief is made to his cross-examination between pages 819 and 858, inclusive, in the transcript. That there is omitted any reference to the following facts:
   (1) The man for whom the pay was allegedly to be obtained was a Corporal Clarke of the Casual Company 3rd Battalion; that normally enlisted personnel in that group are paid on the 5th and 20th of each month; that appellant admitted "if the corporal only had four days pay coming it would probably be nothing."
   (2) Appellant made no attempt, by telephone, before leaving his unguarded children and driving twenty-one miles, to determine, from the man he knew to be on duty, whether any sum was due Clarke.
   (3) Appellant couldn't recall ever having made a similar payment to that which he professed he was about to make on June 24th, 1957.
   (4) Appellant parked his car at a more remote spot from his office, though closer space was available (Tr. p. 827).
   (5) Appellant moved from the counter (when he gave Tetems the slip of paper on which he (Hansberry) had written) to the telephone, and before he could place a call, felt a gun in his back. The alleged gun-holder had moved into such position without being seen or heard by appellant, Tetems, or any of the other persons around the path to the office. (Tr. p. 833.)
   (6) Appellant drove a Tudor-sedan from which a driver could have direct means of exist, but the person supposedly in the back seat had none. Appellant knew this when driving a four mile drive past hundreds of men circulating in the street (Tr. p. 845) to a sentry booth where he knew one guard (or perhaps two) was armed with a loaded "forty five" and had to approve his departure. (Tr. 845–847.)
   (7) Appellant, allegedly struck five times with some instrument sufficiently hard to become unconscious, when taken to the hospital:
   (i) required no stitches;
   (ii) had a normal pulse;
   (iii) had a normal blood pressure;
   (iv) had ten aspirins as medication.

the property located at 704 Strand Street, the witness testifies that $2,-000.00 of the down payment was represented by a money order which was sent to his wife by a relative. The witness is later impeached on this point and it is developed that he wired the $2,000.00 to his wife in September of 1956 from San Diego."

Appellee has included as its Appendix II the testimony of both Mrs. Hansberry and Mr. Hansberry on this subject. We will not quote the evidence in full— but it demonstrates that of a certainty appellant (and inferentially, his wife) lied repeatedly upon the witness stand as to an extremely material point. (Mrs. Hansberry: Tr. pp. 678–679; 693–694; 728–731.)[3] (Mr. Hansberry: Tr. pp. 886; 975–983; 991–995.)[4]

[3] We can only say that a reading of the record not only establishes the suffi-

---

3. "Q. * * * Now, you have listed here a $2,000 Money Order in 1956. I believe you testified on direct examination that that was a result of a loan, is that correct? A. Yes.

"Q. It was a loan? A. It was a loan at that time.

"Q. And you were the borrower; is that right? A. That's right.

"Q. Who was the lender? A. A cousin.

"Q. A what? A. A cousin.

"Q. A cousin of yours? A. (Witness nods head.)

"Q. What was his name? A. Frederick Fowler.

"Q. Frederick Fowler. Where does he live? A. I don't know where he lives now.

"Q. Where did he live then? A. He lived in San Diego, I believe, at the time.

"Q. In San Diego? A. Yes.

"Q. Where in San Diego? A. I wouldn't know without looking it up.

"Q. He is a cousin. How old a man is he? A. I don't really know how old.

"Q. Well, is he your age, younger, or older? A. Older.

"Q. How much older? A. Let's put it this way: My grandmother's maiden name is Fowler and he is a second cousin once or twice removed. Now, whether he is 40 or whether he is 70—in between there some place.

"Q. Okeh. What was his business at the time? A. Retired.

"Q. Retired? A. Retired, I believe.

"Q. Retired, living in San Diego? A. As far as I know.

"Q. Just tell us how you happened to borrow the $2,000 from him. A. That was in September of '56.

"Q. All right. A. Mr. Seavey, I wanted a divorce in September of '56.

"Q. You say you wanted a divorce? A. Yes, I wanted a divorce—

"Q. Yes. A. —in September of '56, so I mentioned this and I said what I felt it would take to clear what I owed personally, et cetera, and possibly pay for the divorce.

"Q. You mean you mentioned this to Mr. Fowler? A. Yes.

"Q. But you didn't have a divorce, did you, in September of '56? A. I discussed the matter with my lawyer.

"Q. But in fact you put the $2,000 in real estate, didn't you? A. Yes." (Appendix II, pp. 5–7.)

4. "Now, would you read to the jury, please, 52–D? A. It is made out in the amount of Two thousand dollars, Mrs. Barbara Jean Hansberry, 1521 San Jose Street, Oceanside, California.

Sender's name: Frederick R. Fowler

"Q. Sender's address? A. 'Sender's address: 368 Bush Street, San Francisco, California.'

"Q. And what does the message say?

"The Witness: Message says—looks like 'Group'—'Gramps thinks you live next door. Send him your address—sent him your address. Thought at first it was mine. Love, Bob.'

"Q. And you sent that from the San Diego office? A. Yes, I did.

"Q. On the 27th of September? A. On the 27th of September, 1956.

"Q. And, Captain, you sent it to cover up the fact that that money was public money that came out of your safe? A. No, I did not.

"Q. Captain, you forged the name of a fictitious individual, did you not? A. I put a name on here 'Love, Bob,' yes.

"Q. And you also put the name on there 'Frederick R. Fowler,' did you not? A. There is a printed name on here 'Frederick R. Fowler,' yes.

"Q. You printed that, did you not? A. Yes.

"Q. And you printed a name of a fictitious individual on that Money Order application? A. Yes, I did.

"Q. And you signed it 'Bob' by a fictitious name; is that correct? A. There is a long story behind this that I would like to tell if I may at this time.

"Q. All right. Captain, tell us your story. A. Frederick Fowler was a relative so far distant from my wife's family

ciency of the evidence of the guilt of the appellant to go to the jury, but leaves this court with no room for reasonable doubt as to his guilt. We cannot void the jury's verdict.

## II—The "Net Worth Theory."

■ The second, third and fourth errors urged relate to something originating in the mind and the choice of verbiage of appellant's counsel—i. e., that the trial court permitted the government to prove embezzlement by the use of "a net worth theory." This, says appellant, contaminates all evidence introduced relating to incidents and facts existing prior to June 24, 1957, which evidence, says appellant, should have been stricken; and that it was error not to.

We cannot agree. Appellant takes the position he was perfectly "clean," under the evidence, until the night of June 24, 1957—that there was no evidence of embezzlement up until that night. That is simply not so.

"My cash book," says appellant, "was audited by the Marine Corps and Navy Area Audit team. They found nothing wrong, therefore there could have been no embezzlement prior to the alleged robbery."

This ignores the testimony that the "audits" were in reality merely "a verification audit of the cash." (R.T. p. 235.)

"Nichols' verification consisted of computing from the entries in the appellant's cash book the amount of cash which should have been in the safe and counting the cash there to see if the totals checked out. The result of this audit was that cash on hand plus the vouchers held as cash equaled the balance in the cash book. Nichols' computation pertaining to entries in the cash book consisted of a check to see if the totals for the month of November had been correctly brought forward and then

---

that it's almost hard to touch—almost impossible to touch. Frederick Fowler was a man of I'd say, about 68 years old. My wife met him somewhere in connection with a business deal of some kind, and they met many times in Los Angeles. They talked a lot. He acted almost like a father to her. Then in September of 1956 my wife and I almost split up. She wanted a divorce. I said 'No,' that we had to take care of things, get the kids taken care of, get them old enough that they could take care of themselves.

She went to Frederick Fowler and told him the problem and asked for money to get a divorce with. Frederick Fowler then came and made an appointment with me to meet me in San Diego and talk to me about it. I did in fact meet Frederick Fowler here in San Diego on the 27th. We talked for a long time about it. He said he would not loan her money for the divorce and wanted to know what I thought about it, what steps we could take to save it.

I took $2,000 out of the building fund and I put it into this telegram and sent it to her under the name of Fowler. She still thinks to this day that she owes Fowler $2,000.

"Q. Whereas, actually, you owe the Government $2,000, Captain, isn't that so? A. That is not so. My money was

counted three times after that and every cent of it was in the safe after that. It was counted twice in December just two months after this and every cent is accounted for in that safe on that date.

There is a lot of things in my background that nobody has even bothered to ask me about up until this time. It's not easy to sit here and tell you that my family have almost broken up three and four times over this thing. It is not easy at all.

"Q. Captain, no one has forced you to take the stand; isn't that correct? A. That is correct.

"Q. You voluntarily have come into the court to offer testimony? A. That's right.

"Q. Now, Captain, you—this morning your testimony, I believe, was that—to the effect that you were not in San Diego on the 27th of September. A. I didn't want to sit here—

"Q. And that you did not know a Frederick Fowler. A. I had hoped I wouldn't have to sit here and tell you that.

"Q. Your testimony was that you were not at the Western Union office on the 27th of September? A. That is correct.

"Q. And your testimony was that you did not furnish the $2,000 used in that telegram. A. That is true." (Appendix II, pp. 14-17.)

totaling the entries for the period of the first to the tenth of December to arrive at cash figure shown by the cash book. This computation did not include a check of all the vouchers held as cash to determine whether the persons credited by appellant with having received money had actually received the money." (Appellee's Brief, p. 12.)

The fact that the monthly financial statements to the General Accounting Office in Washington "balanced" does not prove that appellant's cash book (which never went to Washington) balanced, or that the entries in it were proper or truthful, or that appellant had not embezzled funds prior to June 24, 1957.

Appellant's position also ignores the fact that "something was wrong" with his books, no matter how audited. As an example: No entry had been made in December 1956 of $30,000 Hansberry had withdrawn for three days (Tr. 1039–42).

We need not go into details with respect to appellant's (and his wife's) income, for the twenty-three months between December 1955 and October 1957, of $19,679.96. Appellant could remember no other income (Tr. 1157). During that same twenty-three months appellant spent $47,656.71 (Tr. 1158–1161). No explanation was made by appellant, save that he kept a large ($5,000) "cash building fund" in his bureau drawer, and his wife earned certain minor and unspecified commissions. Such explanations could well have been deemed less than satisfactory by any trier of fact, to say the least.

The principal case relied upon by appellant is Dobbins v. United States, 1946, 81 U.S.App.D.C. 218, 157 F.2d 257. That case itself is authority for the proposition that wrongful intent "may be proved directly; or it may be inferred from the circumstance of the case as disclosed by the evidence * * *. The inference must be deduced by the jury, and not by the court." Id., 157 F.2d at page 260. Cf. Loewe v. United States, 9 Cir., 1943, 135 F.2d 622.

Clearly, evidence of large expenditures or the acquisition of large *unexplained* sums of money, during the time charged as that during which the embezzlement took place, is some evidence of such embezzlement. United States v. Howell, 3 Cir., 1956, 240 F.2d 149, 158; Hansbrough v. United States, 8 Cir., 1946, 156 F.2d 327, 329; United States v. Jackskion, 2 Cir., 1939, 102 F.2d 683, 684, 123 A.L.R. 116, certiorari denied 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517; O'Shea v. United States, 6 Cir., 1937, 93 F.2d 169, 172; 1 Wigmore on Evidence (3d Ed.) § 154.

By reason of this authority, there was no basis for any instructions to the jury on any "net worth theory." None were submitted or requested by appellant. (Rule 30, Fed.R.Crim.P.) No objection was made to the instructions given. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, is inappropriate.

### III—Error in Instructions.

We next reach appellant's point that there was error in instructions as to reasonable doubt. The instructions as given were proper (Tr. 1267–68). Taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury. Holland v. United States, supra, 348 U.S. at page 140, 75 S.Ct. at page 127.

Furthermore, concededly no objection was made below to the instructions as given. It is now too late to raise technical objections as to whether the word "it" refers to the noun last previously used in the instruction, or to the subject of previous "it"s. This type of alleged error is peculiarly one which must be brought to the attention of the court below, else it is waived. Ryan v. United States, 9 Cir., 1960, 278 F.2d 836, 839. Fed.R.Crim.P. 30.

We find no error in the instructions. In fact, no error appears in the record. We fail to understand how any verdict

other than guilty could have been rendered by the jury on the evidence before it.

The judgment of conviction is affirmed. The motion to assess costs against appellant is denied.